**ALPIRN et al. v. WILLIAMS STEEL & SUPPLY CO.**

No. 10596.

United States Court of Appeals, Seventh Circuit.

Nov. 5, 1952.

Arthur Magidson, Emil Hersh, Frederick Hersh, Milwaukee, Wis. (Jack W. Marer, Omaha, Neb., of counsel), for appellant.

Ben L. Chernov, Robert A. Hess, Milwaukee, Wis., for appellee.

Before MAJOR, Chief Judge, FINNEGAN and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

The plaintiff, Morton Alpirn, d/b/a Western Smelting & Refining Co., was engaged in the business of buying and selling metal products, including steel pipe, as a broker, wholesaler and dealer in Omaha, Nebraska. On November 14, 1947, after the exchange of several letters and telegrams and after he had been furnished a sample of steel pipe, the plaintiffs ordered by letter from the defendant, Herman Williams, d/b/a Williams Steel & Supply Co., in Milwaukee, Wisconsin, "new steel pipe" which was described as follows:

"½ inch new galvanized hot dipped steel pipe 21 feet lengths as per sample recently submitted, the pipe not to be plugged, 40,000 feet at 13½¢ per foot FOB Chicago, Illinois. Shipment to be made November 18, 1947."

This letter also stated that the plaintiff was enclosing a bank cashier's check in the amount of $4,000.00; and that the parties had agreed that, should any lengths be received by the plaintiff which were plugged, Williams would accept the return of same and allow the plaintiff freight charges also. The letter also authorized the defendant to draw a draft on the plaintiff for the unpaid balance of the purchase price. The total price of this pipe, at 13½¢ per foot, was $5,400. In later communications the parties agreed that the pipe was to be

shipped to the plaintiff C. O. D. as to the unpaid balance of $1,400, and the pipe was so shipped.

When the shipment of this pipe arrived in Omaha it was sent to the warehouse of Morris Levey to whom the plaintiff had negotiated a sale of the pipe at 18¾¢ per foot. When Mr. Levey arrived at the warehouse the truckdriver had unloaded 40 or 50 pieces of pipe and had then been stopped by Levey's foreman who did not consider the pipe satisfactory. After Levey's arrival he examined the pipe that had been unloaded and then took a few pieces off of the truck "to see if it was probably some just on top, and we walked around the truck and looked as far as we could without unloading it all, and when we saw that it was all of that nature I (Levey) said, 'Let's call Morton Alpirn.'"

Mr. Alpirn said that when he arrived at Levey's warehouse about 50 pieces of the pipe had been removed from the truck and that Mr. Levey and his employee and the plaintiff's brother-in-law were inspecting them. The plaintiff testified that after the pipe had been inspected he notified the defendant that the pipe had arrived and was rejected because it was not in accordance with the contract.

The plaintiff thereafter brought an action for the alleged breach of the contract in the United States District Court for the Eastern District of Wisconsin against the defendant Herman Williams and against the corporate defendant Williams Steel and Supply Co., which had then become the successor to the business of the individual defendant and had assumed the obligations of his business. The plaintiff alleged damages of the $4,000 he had paid to the defendant as part of the purchase price and $2,100 as a loss of profit by the plaintiff on the resale of the pipe to Levey which the plaintiff alleged he could not make because of the failure of the pipe to meet the specifications of the contract of purchase from Williams.

The defendant filed an answer and counterclaim alleging that the pipe shipped to the plaintiff substantially met the specifications of the contract and that the plain-

tiff had rejected the shipment without cause and refused to pay the balance of the purchase price. The defendant further alleged that after plaintiff's rejection, defendant, in order to minimize the damage, took possession of the pipe and resold it and that after charging to the plaintiff the expenses on the resale, there was a balance due plaintiff of $1,233.88 from the $4,000 which the plaintiff had originally paid but that the defendant had sustained damages of $907.35 because of a writ of attachment which plaintiff had caused to be issued against the pipe without cause and that this amount should be deducted from the refund owing to the plaintiff, thereby leaving a balance of only $326.53 due to the plaintiff.

The action was tried to the District Court without a jury. The court found that the defendant had breached the contract "in that the pipe as tendered was not in accordance with the written specifications and express warranties contained in the contract between the parties, and, further, was not as per sample furnished." As specific instances of the defects in the pipe the court found that:

"(a) The pipe was rough on the outside to an excessive degree, making it difficult to thread the said pipe by the use of a guide die.

"(b) The galvanizing on the pipe was uneven and irregular.

"(c) The pipe did not permit the insertion through it of a baling wire approximately ⅛ inches in diameter.

"(d) A substantial majority of said pipe was plugged.

"(e) The pipe was of irregular diameters at the ends and not of a uniform diameter throughout its length in accordance with the specifications prescribed in the contract between the parties, and of new one-half inch pipe of this description.

"(f) That daylight could not be seen through the lengths of the pipe with the naked eye when said lengths were held in a horizontal position by two persons."

The court found, further, that, because of the defects in the pipe, the shipment was first rejected by Levey, to whom a sale of the pipe at 18¾¢ per foot had been negotiated by the plaintiff, and the pipe was also rejected by the plaintiff who forthwith notified the defendant; and that plaintiff was unable to procure other pipe with which to fill his contract with Levey. The court also found that the defendant Williams knew that the plaintiff was a dealer in metals and knew that in the normal course of business the plaintiff would resell this pipe to other persons; that the contract between the plaintiff and Morris Levey to sell the pipe to Levey was "a bona fide, arms-length agreement which was indicative of the fact that the market price of pipe of the said specifications was at least Eighteen and Three-fourths Cents (18¾¢) plus freight in Omaha in November, 1947"; that by reason of the defendant's breach of the contract, the plaintiff had sustained damages in the amount of $2,100 by losing the sale to Levey at 18¾¢ per foot (which the court also found was the market price of pipe meeting the specifications); and that the plaintiff was entitled to the return of the $4,000 which he had paid on the purchase price of the pipe.

The defendant contends that where, as here, a sale is for cash on delivery and the buyer fails to make such payment prior to delivery, the buyer does not have the right to inspect the goods and to reject the shipment for failure of the shipment to meet the specifications, and, further, that, under these circumstances, the buyer had no right to bring an action for a breach of the contract.

If we grant, arguendo, that under the strict terms of the contract the plaintiff was not given the right to inspect the shipment prior to his payment of the balance of the purchase price, the fact remains that such an inspection was made and that the inspection revealed that the shipment consisted of pipe substantially inferior to the pipe which the plaintiff had contracted to buy. The inspection was made by the plaintiff at the warehouse of Levey where the truckdriver had started to unload the pipe on Levey's shipping dock. There it was in plain sight of anyone who happened to be there and wanted to look at it. It is

not apparent who, if anyone, told the truck-driver to start unloading the pipe. If the contract had been for the purchase of a horse and the attempted delivery had been of a cow which the plaintiff saw, surely the defendant would not contend that the plaintiff was under an obligation to pay the balance of the purchase price before rejecting delivery of the cow. Certainly, before there was any duty on the plaintiff to pay, there was the obligation of the defendant to deliver, or have ready for delivery, the pipe which the plaintiff had bought.

While the record contains some conflicting evidence as to the condition of the pipe and as to the methods used in testing it, there was an abundance of evidence, when we consider the record as a whole, to justify the court's finding that the pipe tendered neither met the written specifications of the contract of purchase nor corresponded to the sample furnished by the defendant. The plaintiff, seeing the pipe under the circumstances of this case and realizing that it did not conform to the specifications of the contract nor to the sample, was under no duty to pay the balance of the purchase price before rejecting the pipe. It was the duty of the defendant, at the time of the payment of the balance of the purchase price, to deliver, or tender for delivery, pipe meeting the specifications of the contract and conforming to the sample. At that time the plaintiff knew that the defendant could not do this. The plaintiff was, therefore, neither bound to accept delivery nor to pay the balance of the purchase price. Sec. 121.41, Wis.Stat.1947; Hageman v. Ule, 188 Wis. 617, 620, 206 N.W. 842.

The defendant insists that since the contract of the parties included the provision that the defendant would accept the return of any lengths of the pipe that were plugged and would allow freight charges on same, this constituted plaintiff's exclusive remedy and precluded the rejection of the entire shipment and an action by the plaintiff for breach of the contract. The decisions cited by the defendant in support of this proposition do not so hold. In Sharples Separator Co. v. Domestic Electric Refrigerator Corp., 3 Cir., 61 F.2d 499, 500, the contract of sale expressly provided that the sole remedy of the buyer should be the replacement of mechanical parts " 'which do not meet this guarantee and which are returned to the Manufacturer within one year from the date of their original shipment.' " In Lee v. Jensen, 189 Wis. 286, 206 N.W. 880, 881, the contract was for the purchase of "tobacco of certain specified grades out of the plaintiff's entire crop". There the written contract between the parties provided that when the crop was ready for delivery the buyer should inspect it and "if the amount of damage cannot be satisfactorily agreed upon, the seller agrees to return the advance money and surrender this contract at the time of examination." There the court held, in deciding for the seller, that the contract required the buyer to make a good faith examination of the tobacco and also to make a good faith effort to agree on the amount of damages, and that until the buyer had done this, he was not in a position to refuse to perform his part of the contract. However, the court there recognized that the parties had, by their particular contract, taken themselves out of the general rule which permits rejection by the buyer of an entire shipment where a portion of the goods delivered or tendered does not meet the specifications of the contract. The court there said:

"This case is to be distinguished for the reasons already pointed out from cases where a buyer bargains for goods of a specified quality under circumstances which require the seller to tender goods which strictly conform to the terms of the contract. * * * This is rather an unusual circumstance, and attention is called to it for the purpose of indicating that we have not overlooked nor departed from the established principles of law as to performance of a contract for the sale of goods."

The third case cited by the defendant on this point, Renne v. Volk, 188 Wis. 508, 205 N.W. 385, only held that parties to a sales contract had the right to vary the general rules of law and the provisions of

the uniform sales act by inserting in a sales contract particular provisions.

The defendant contends that the first examination of the pipe by Levey and Alpirn did not disclose the true condition of the shipment because an insufficient number of pieces were examined and that the tests used had no probative value. Mr. Levey testified that when he arrived at his warehouse where the pipe was being unloaded, about 40 or 50 pieces had been unloaded by the truckdriver before Levey's foreman had stopped the unloading because of the unsatisfactory condition of the pipe. Mr. Levey said that: " * * * then we took a few pieces off the truck to see if it was probably some just on the top, and we walked around the truck and looked as far as we could without unloading it all, and when we saw that it was all of that nature * * *."

■ The witness, Clarence R. Dodds, chief plumbing inspector of the City of Omaha, inspected the pipe at the request of the attorney who was acting for the defendant. At the time of his inspection the pipe had all been unloaded from the truck and he did not move any of the pile to procure the particular pieces which he examined. This would necessarily mean that he did not inspect the same pieces which had been inspected by Alpirn and Levey because those pieces would have been on the bottom of the pile. Dodds testified as to the general defects of the pipe and then said that half of the pieces he examined were plugged. We think the testimony of these and other witnesses, when considered with all of the other evidence in this case, furnished a reasonable basis for an inference by the trial court that the first inspection by Levey and Alpirn was sufficient to reveal the true condition of the pipe and to show that the shipment did not meet the specifications nor correspond to the sample, and that the inspection, therefore, furnished Levey and Alpirn sufficient grounds for refusing to accept the shipment.

■ The defendant attaches great significance to the testimony of Dodds and Kline that the orignal tests made by Alpirn and Levey were not proper tests as to the

pipe being plugged. But Dodds not only testified that half of the pieces which he personally examined were plugged, but also said that some of the pipe ends were plugged with slugs of galvanized material. This condition, of course, would be obvious to anyone looking at the pipe without attempting to look through the pipe or to make other tests.

■ Finally, the defendant contends that the trial court applied an erroneous measure of damages; that the measure specified by the Uniform Sales Act was not used. The defendant cites Secs. 69(6) and 69(7) of the Uniform Sales Act, Secs. 121.69(6) and 121.69(7), Wis.Stats., as a general rule on damages for breach of warranty. These sections are as follows:

"(6) The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty.

"(7) In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty."

It is to be noted that Sec. 69(6) expressly covers "loss directly and naturally, resulting in the ordinary course of events, from the breach of warranty" and that Sec. 69(7) fixes the amount of damages only "in the absence of special circumstances showing proximate damage of a greater amount."

Section 70 of the Act, Sec. 121.70, Wis. Stats., provides:

"Nothing in this act shall affect the right of the buyer or the seller to recover interest or special damages in any case where by law interest or special damages may be recoverable, or to recover money paid where the consideration for the payment of it has failed."

The defendant insists that he had no knowledge of the contract of sale between

Alpirn and Levey; that he did not, himself, contract with reference thereto; and that the price fixed in the Levey contract, therefore, was not a proper measure of special damages. While there was testimony to the effect that the plaintiff told the defendant by phone of the contract with Levey, the court did not find this as a fact, but the court did find that the defendant Williams knew that the plaintiff was a dealer in metals and knew that in the normal course of business the plaintiff would resell this pipe to other persons. The court also found that the contract between the plaintiff and Levey "was a bona fide, arms-length agreement which was indicative of the fact that the market price of pipe of the said specifications was at least Eighteen and Three-fourths Cents (18¾¢) plus freight in Omaha in November, 1947."

It is true that the courts in many cases have refused to award damages for the alleged loss of profits on resales by the buyers. This has been done usually on the theory that such profits were not contemplated by the parties or on the theory that the amount of such profits would be so speculative that they could not be determined with any certainty. Neither of these reasons applies in the instant case. Here the seller knew that the buyer was a dealer who bought for resale. The testimony of Gerald Mintz, the defendant's sales manager, explaining that they sent a sample of the pipe to the plaintiff because " * * * we wanted to make sure that Mr. Alpirn *and whoever he might have been selling it to* realized that," indicated that he knew that at the time Alpirn contracted to buy the pipe Alpirn then had a third party to whom he was going to sell it. (Our emphasis.) Since Alpirn was in that business, it would naturally be inferred that the resale was to be at a profit. The contract which Alpirn admittedly had negotiated with Levey was for a price which would have yielded to him a profit of 5¼¢ per foot. Alpirn could not obtain the pipe elsewhere so the failure of the defendant to deliver pipe which would meet the specifications of the contract caused the plaintiff to lose the profit of $2,100.00

In support of his contention that the loss of profit by the plaintiff did not constitute a proper item of damage, the defendant cites Schaefer v. Fiedler, 116 Ind.App. 226, 63 N.E.2d 310. The contract there involved the purchase of a combine by a farmer for use on his own farm. The court properly refused to allow him damages for loss of profits caused by his being unable to use the combine to harvest the crops of others. There the buyer testified that he did not purchase the combine for that purpose. The defendant also cites Armstrong Rubber Co. v. Griffith, 2 Cir., 43 F.2d 689, which was an action for the purchase price of automobile tires sold to a dealer who claimed damages for diversion of customers because of the defects in the tires. The court there held that such "an uncertain and perilous risk as indemnification against loss through alienation of customers was never contemplated by the parties to the contract."

The defendant has cited no decision of the Supreme Court of Wisconsin on this point. Yet we find decisions of that court in which the question has been considered. In Kelley, Maus & Co. v. La Crosse Carriage Co., 120 Wis. 84, 97 N.W. 674, 675, that court, in discussing the limitation that special damages on a contract for the sale of personal property must not be so uncertain and conjectural that they cannot, with practical safety, be ascertained, said:

"It is under this last limitation that prospective profits have in many cases been held not a proper measure of damages. If, however, the contemplated result of breach of a contract is to deprive the innocent party of profits, the defaulting party ought to compensate him therefor. Otherwise complete justice is not done, and the contract, which in ultimate analysis is the foundation of commerce, is robbed wholly or partially of its sanction. Only when the estimate of prospective profits involves such degree of speculation and uncertainty that it is likely to work injustice, rather than justice, should courts reject it if loss of profits is the result of the breach of the contract."

Again in Gross v. Heckert, 120 Wis. 314, 329, 97 N.W. 952, 957, the Supreme Court of Wisconsin indicated that such damages were recoverable where there was evidence "to base the same on sufficiently certain to remove the result from the realms of pure conjecture." In Hudson Rug Refinishing & Cleaning Co. v. Prime Mfg. Co., 7 Cir., 115 F.2d 615, this court held that the buyer under a Wisconsin contract could recover special damages under Secs. 121.69(6) and 121.70 for failure of the property purchased to be as represented.

It was not necessary for the plaintiff to show that the defendant knew the terms of plaintiff's contract of sale with Levey. In Kelley, Maus & Co. v. La Crosse Carriage Co., 120 Wis. 84, 94, 97 N.W. 674, 677, the court said that, since business is ordinarily operated at a profit, a reasonable man may be assumed to contemplate that an interruption of its operation would cause loss to its owners. There the court said: "He need not know in detail just what loss, provided it be reasonable and within usual experience."

In the instant case there was nothing in the evidence to compel an inference by the trial court that the price fixed in the contract between Alpirn and Levey was so extraordinary and unusual that it would not have been within the contemplation of the defendant. All of the witnesses testified that at the time this contract was made there was not an open market on steel pipe of this type and that any dealer could sell more of it than he could buy.

We hold that the trial court was justified in allowing to the plaintiff damages for the profit he lost because he was unable to fulfil his contract with Levey. Since this is sufficient to sustain the finding of damages in the amount of $2,100, it is unnecessary for us to consider whether there was evidence sufficient to sustain the court's finding that at that time the market price of steel pipe meeting the specifications of this contract and corresponding to the sample furnished was 18¾¢ per foot.

Finding no error, the judgment of the District Court is affirmed.